# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

JOSEPH ALLEN DAVIS, on behalf of
Himself and others similarly situated,

Plaintiff,

vs. Case No.: 1:24-cv-00187-PAB

CLEAR HEALTH, LLC,

Defendant.
_______________________________________/

**DEFENDANT CLEAR HEALTH, LLC'S MOTION TO COMPEL ARBITRATION**

Defendant Clear Health, LLC ("Clear Health"), pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. ("FAA"), moves to compel arbitration and to stay this proceeding under 9 U.S.C. § 3 until the arbitrator enters a final award. A memorandum in support of this Motion is attached.

Dated: June 3, 2024

GREENSPOON MARDER LLP

*/s/ Roy Taub*
Jeffrey A. Backman
(*pro hac vice* application forthcoming)
Roy Taub (*pro hac vice*)
200 E. Broward Blvd., Suite 1800
Ft. Lauderdale, FL 33301
(954) 491-1120
jeffrey.backman@gmlaw.com
mary.torres@gmlaw.com
roy.taub@gmlaw.com
cheryl.cochran@gmlaw.com

Douglas R. Sargent
Ohio Bar No. 97486
227 W. Monroe, Suite 3950
Chicago, IL 60606
(773) 395-1601
doug.sargent@gmlaw.com

*Attorneys for Defendant Clear Health, LLC*

**FOR THE NORTHERN DISTRICT OF OHIO**

JOSEPH ALLEN DAVIS, on behalf of
Himself and others similarly situated,

Plaintiff,

vs. Case No.: 1:24-cv-00187-PAB

CLEAR HEALTH, LLC,

Defendant.
___________________________________________/

**MEMORANDUM IN SUPPORT OF DEFENDANT**
**CLEAR HEALTH, LLC'S MOTION TO COMPEL ARBITRATION**

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether the Court should compel Plaintiff to submit his asserted claims to arbitration.

## PRELIMINARY STATEMENT

Plaintiff Joseph Allen Davis filed his Complaint on January 31, 2024. *See* Dkt. No. 1 (the "Complaint"). Davis asserts a single cause of action against Clear Health under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), alleging Clear Health called him in violation of the TCPA's national registry "do-not-call" rules. *See id*. at ¶¶ 45-49. Davis alleges Clear Health called him because he spoke with a Clear Health employee after calling back a number on January 5, 2024, (*id.* at ¶¶ 21, 27-28), but the number he called was used by Prospects DM, Inc. ("Prospects"), and it transferred Davis to Clear Health only after Plaintiff had called and expressed interest in an insurance quote. More importantly for this Motion, the preceding calls from Prospects were made soley based upon a consent-based lead generated on a website.

Plaintiff knowingly and voluntarily provided his telephone number and other personal information on the website American Career Guide at the URL https://jobs.theamericancareerguide.com/api/offer (the "Site"). The Site is an aggregator of information about jobs from third parties, and visitors have to enter certain information to use certain services on the website. When Plaintiff provided his information and made a submission on the Site, he consented to receive telephone calls from a list of marketing partners, including Health Insurer Quotes and Prospects DM, and expressly agreed to Terms and Conditions requiring arbitration of the claims asserted in this lawsuit and waiving the right to bring a class proceeding.

Under settled principles of law and in furtherance of the strong federal policy in favor of enforcement of arbitration agreements, this Court should compel Plaintiff to proceed to arbitration. Another court in this District recently enforced virtually identical arbitration provisions and site layout in a putative class action lawsuit. *See Nelums v. Am.'s Lift Chairs, LLC*, No. 1:22-CV-00739, 2023 WL 6161997 (N.D. Ohio Sept. 21, 2023). As was done in *Nelums*, the Motion to Compel Arbitration should be granted with all issues delegated to the arbitrator.

## STATEMENT OF FACTS

On September 7, 2023 at or around 3:52 p.m. Eastern Daylight Time, Davis visited a website bearing the name "American Career Guide" at the URL https://jobs.theamericancareerguide.com/api/offer (the "Site"), which is owned and operated by C4R Media Corp. ("C4R Media"). Declaration of Ben Zitter at ¶¶ 3-7. To enter the Site the user must first confirm their contact information by entering their first name, last name, email address, phone number, and zip code. Then, the user must click a button labeled "Continue," which has language immediately above it saying, "By clicking the button below, I confirm I am over 18 and I agree to: (i) the **Privacy Policy** and **Terms and Conditions** . . . and (iii) **How It Works**," as shown in the following partial screenshot:




*Id*. at ¶ 9.

Only by clicking the "Continue" button did Davis advance to the next page of the website. This page prompted Davis to confirm his telephone number, where he re-entered his telephone number, and checked a box confirming his consent to receive sales calls and/or text messages from C4R Media or other marketing partners that are provided in a hyperlinked listing, including Health Insurer Quotes and Prospects DM. *Id.* at ¶¶ 12-14, 18-19. The layout on the Site is depicted in the following partial screenshot:




*Id.* at ¶ 14.

As reflected in the database entry provided by C4R Media, Davis submitted – actually, re-submitted – his telephone number of (220) 203-8888 on the Site on September 7, 2023. *Id.* at ¶ 15 & Ex. C thereto. Davis's information would not have been provided to Prospects had he not checked the box and confirmed his consent to be called. *Id.*

Clicking on the hyperlink for the "Terms and Conditions" on the website opens up a webpage containing the Site's Terms and Conditions being agreed to. *Id.* at ¶ 10 & Ex. A thereto. The arbitration provision appears under the heading "Dispute Resolution Provisions" (hereinafter the "Arbitration Agreement"), and states in relevant part, in mostly bolded language:

> The Agreement shall be treated as though it were executed and performed in New York, New York and shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflict of law principles). **Should a dispute arise concerning the Website, Promotions, Content, the terms and conditions of the Agreement or the breach of same by any party hereto: (a) the parties agree to submit their dispute for resolution by arbitration before a reputable arbitration organization as mutually agreed upon by the parties in New York, New York, in accordance with the then-current Commercial Arbitration rules of the American Arbitration Association . . . .**
>
> **The parties agree that the arbitrator shall not consolidate more than one person's claims, and shall not otherwise preside over any form of a representative or class proceeding. . . .**
>
> **To the extent permitted by law, you agree that you will not bring, join or**

> **participate in any class action lawsuit as to any claim, dispute or controversy that you may have against Company and/or its employees, officers, directors, members, representatives and/or assigns. . . . This provision preventing you from bringing, joining or participating in class action lawsuits: (i) does not constitute a waiver of any of your rights or remedies to pursue a claim individually and not as a class action in binding arbitration as provided above; and (ii) is an independent agreement. You may opt-out of these dispute resolution provisions by providing written notice of your decision within thirty (30) days of the date that you first access the Website.**

*Id*. at ¶ 10, Ex. A at 3-4 (emphasis in original).

## ARGUMENT

### I. LEGAL STANDARDS

Section 4 of the FAA permits a court to compel arbitration when one party, as in this case, has failed, neglected, or refused to comply with an arbitration agreement. 9 U.S.C. § 4. Arbitration agreements are governed by and enforceable under the FAA. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 23-24 (1991). "[T]he FAA governs the enforceability of arbitration clauses generally," "although state law may dictate the standards for generally applicable contract defenses . . . ." *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 887 (6th Cir. 2002) (internal quotations omitted). The FAA and the strong federal policy favoring arbitration that it evidences require courts to "rigorously enforce agreements to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). Consistent with that strong federal policy favoring arbitration, "[f]ederal law counsels that questions of arbitrability, when in doubt, should be resolved in favor of arbitration." *Id.* (citing *Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).[1] Thus, "as a matter of federal law, any doubts concerning the scope

[1] *See also Ciccio v. SmileDirectClub, LLC*, 2 F.4th 577, 583 (6th Cir. 2021) ("[C]ourts must rigorously enforce arbitration agreements according to their terms") (internal quotation omitted); *Glazer v. Lehman Bros.*, 394 F.3d 444, 450 (6th Cir. 2005) ("[I]t is well-established that any doubts regarding arbitrability must be resolved in favor of arbitration, because there is a strong presumption in favor of arbitration under the FAA.") (internal citation omitted).

of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Cone Mem'l*, 460 U.S. at 24-25.

The Sixth Circuit has instructed that,

> [w]hen considering a motion to stay proceedings and compel arbitration under the Act, a court has four tasks: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Glazer*, 394 F.3d at 451 (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000)).

## II. THE COURT SHOULD COMPEL ARBITRATION OF DAVIS'S CLAIM

### A. A Valid Written Arbitration Agreement Exists

Davis entered into a valid agreement requiring him to arbitrate his TCPA claim against Clear Health concerning calls resulting from the Site when he agreed to the Terms and Conditions on the Site, including the arbitration provision. While the Court should find that this is an issue that has been delegated to the arbitrator, even if the Court takes up this question in deciding whether arbitration can be compelled, it should find in the affirmative.

#### 1. The Question of the Existence of a Valid Written Arbitration Agreement as to Davis Has Been Delegated to the Arbitrator

As a threshold issue, parties to an arbitration agreement may "agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) (citations omitted). As another court in this District recently ruled, if parties to an arbitration agreement have clearly and unmistakably agreed to delegate issues of arbitrability to the arbitrator, then the court cannot override that intention and the arbitrator must decide these

threshold issues. *Nelums*, 2023 WL 6161997 at *4. *Accord Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 531 (2019); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). "In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein*, 139 S. Ct. at 529.

Here, the Arbitration Agreement provides that the arbitrator – not a court – is to decide issues of arbitrability in stating "agree to submit their dispute for resolution by arbitration before a reputable arbitration organization as mutually agreed upon by the parties in New York, New York, *in accordance with the then-current Commercial Arbitration rules of the American Arbitration Association* . . . ." Zitter Dec. at ¶ 10, Ex. A at 3-4 (emphasis added). Those rules (the "AAA Commercial Rules") expressly reserve to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the *existence*, scope, or *validity* of the arbitration agreement or to the arbitrability of any claim or counterclaim . . . ." AAA Commercial Rules R-7(a) (attached hereto as Exhibit A) (emphases added). Under controlling Sixth Circuit precedent involving AAA rules with identical language, "[t]he incorporation of these rules provides clear and unmistakable evidence that the parties agreed to arbitrate gateway arbitrability question." *Ciccio*, 2 F.4th at 583. In *Nelums*, Judge Ruiz held the exact same arbitration agreement language from C4R Media "mean[s] that the agreement delegates the gateway question of arbitrability to an arbitrator." *Nelums*, 2023 WL 6161997 at *4. *See also id.* at *3.[2] Given the clear and unmistakable intent in the Arbitration Agreement to delegate gateway issues to the

---

[2] To the extent it is relevant, New York law – the law that governs the Terms and Conditions, (Zitter Dec ¶ 10, Ex. A at 3)) – is the same. *See Fritschler v. Draper Mgmt., LLC*, 203 A.D.3d 623, 623 (N.Y. 1st Dep't 2022); *Schindler v. Cellco P'ship*, 200 A.D.3d 505, 505 (N.Y. 1st Dep't 2021).

arbitrator, this Court should compel Davis to arbitrate on the gateway question of arbitrability.[3]

### 2. In the Alternative, the Court Should Find that Davis Entered Into a Valid Arbitration Agreement

Nevertheless, if the Court is of the view that it can and should decide the existence and validity of the Arbitration Agreement, it is plainly evident that both are established here. The Site's Terms and Conditions provide that "[t]he Agreement shall be treated as though it were executed and performed in New York, New York and shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflict of law principles)." Zitter Dec. at ¶ 10, Ex. A at 3. New York law therefore governs.

Under New York law, "[i]t is a basic tenet of contract law that, in order to be binding, a contract requires a meeting of the minds and a manifestation of mutual assent." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019). *See also Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999). "When an offeree does not have actual notice of certain contract terms, [the offeree] is nevertheless bound by such terms if [the offeree] is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Starke*, 913 F.3d at 289. "New commerce on the Internet . . . has not fundamentally changed the principles of contract." *Register.com v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004).

One of the primary means of forming a contract on the Internet is the "'clickwrap' (or 'click-through') agreement, in which website users typically click an 'I agree' box after being presented with a list of terms and conditions of use." *IT Strategies Grp., Inc. v. Allday Consulting Grp., L.L.C.*, 975 F. Supp. 2d 1267, 1280 (S.D. Fla. 2013) (quoting *Hines v. Overstock.com*, 668

[3] The delegation clause thus resolves this Motion. *Accord id.* at *4-5. In an abundance of caution, and to provide a complete analysis, Clear Health also addresses the grounds in favor of compelling arbitration of Davis's claims in the absence of an enforceable delegation clause.

F. Supp. 2d 362, 366 (E.D.N.Y. 2009)). *See also*, *e.g.*, *Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1302 (M.D. Fla. 2018) (explaining clickwrap agreements "require a user to affirmatively click a box on the website acknowledging awareness of an agreement to the terms of service before he or he is allowed to proceed with further utilization of the website") (quoting *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 397 (E.D.N.Y. 2015)).[4]

"Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (applying California law but noting New York and California apply substantially the same rules for determining whether there has been mutual assent necessary to form a contract) (citing *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (collecting cases)). *See also Temple*, 360 F. Supp. 3d at 1302 (applying New York law, observing that "courts generally find" "[c]lickwrap agreements" "enforceable"); *Whitt v. Prosper Funding LLC*, No. 1:15-CV-136-GHW, 2015 WL 4254062, *5 (S.D.N.Y. July 14, 2015) (collecting cases).

A "clickwrap" or "click-through" agreement "requires users to click an 'I agree' box after being presented with a list of terms and conditions of use." *Meyer*, 868 F.3d at 75. To be bound by an arbitration agreement contained in a clickwrap agreement, the web-user must have "reasonable notice of the arbitration provision." *Starke*, 913 F.3d at 292. When determining whether a plaintiff assented to the terms of a web-based contract, courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put [the offeree] on inquiry notice of such terms." *Id.* at 289.

All of these factors are established here. Before entering the Site the user must first confirm

---

[4] This is in contrast to a browsewrap agreement, which generally "consists of a notice on a website stating that the user is agreeing to and is bound by the website's terms of service by merely using the website." *Temple*, 360 F. Supp. 3d at 1302.

their contact information by entering their first name, last name, email address, telephone number, and zip code. Then, the user must click a button labeled "Continue," which has language immediately above it saying, "By clicking the button below, I confirm I am over 18 and I agree to: (i) the Privacy Policy and Terms and Conditions . . . ." Zitter Decl. at ¶¶ 9-14. The Terms and Conditions were in blue font, in contrast with the black font of the surrounding text, signifying a hyperlink. The clickwrap agreement to arbitrate and the hyperlink to the Terms and Conditions thus were conspicuous and clear and placed Davis on notice so as to validly bind him to the terms he was agreeing to, including the Arbitration Agreement. The Second Circuit has held that "a user would have reasonable notice of the existence of the arbitration provision" where "a reasonably prudent smartphone user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found." *Meyer*, 868 F.3d at 77-78.[5] As in *Meyer* and *Temple*, here the layout that Davis was presented on the website provided him "reasonable notice" of the Arbitration Agreement based on the fact that the relevant

> screen was "uncluttered"; the "text, including the hyperlinks to the Terms and Conditions and Privacy Policy, appear[ed] directly below the buttons for registration"; . . . and the hyperlinks [were] in blue . . ."; the "notice of the Terms of Service [was] provided simultaneously to enrollment"; and "[o]nce a user clicks through to the Terms of Service, the section heading ('Dispute Resolution') and the sentence waiving the user's right to a jury trial on relevant claims [were] both bolded."

*Meyer*, 868 F.3d at 78-79. Indeed, where, as here, "[t]he sentence regarding the applicability of the Terms and Conditions . . . is placed directly above the 'Continue' button that any user must click to proceed with using the website" there can be no question that reasonable notice of an

[5] *See also Peiran Zheng v. Live Auctioneers LLC*, No. 20-CV-9744 (JGK), 2021 WL 2043562, *5 (S.D.N.Y. May 21, 2021) (applying *Meyer* as statement of New York law and finding similar facts established notice); *Temple*, 360 F. Supp. 3d at 1304 (finding reasonable notice of agreement where "Plaintiff was cautioned that clicking the 'Get a Quote' button would indicate his acceptance to the Agreement available via the Terms and Conditions Hyperlink").

agreement was given "[b]ecause it is nearly impossible that any user would not see that statement before hitting 'Continue.'" *Bell v. Royal Seas Cruises, Inc*., No. 19-CIV-60752-RAR, 2020 WL 5639947, *6 (S.D. Fla. Sept. 21, 2020). *See also Temple*, 360 F. Supp. 3d at 1304-05 ("Here, the Terms and Conditions Hyperlink was located *above* the 'Get a Quote' button—thus, Plaintiff must have brought the Terms and Conditions Hyperlink within his line of vision before viewing and proceeding to click the 'Get a Quote' button.").

Davis thus was made aware of the Arbitration Agreement on the website (in the Terms and Conditions) and affirmatively expressed his agreement to it. *See generally* Zitter Decl. at ¶¶ 7-27 & Exs. A, C, and D. In fact, notice is undeniable given that he was "require[d] . . . to click an acknowledgement during the [submission] process." *Bell*, 2020 WL 5639947 at *5. Moreover, a "session replay" using data tracked by an industry leader in lead validation and verification, ActiveProspect, during Davis's visit to the website provides visual evidence of his submission, which could not have done unless he clicked "Continue" after being told that by so clicking, "I agree to . . . the Privacy Policy and Terms and Conditions. . . ." Zitter Decl. at ¶¶ 15-16, 20-27, Ex. D. Davis agreed to the Terms and Conditions and there is a valid agreement to arbitrate.[6]

**B. Davis's TCPA Claims Raise Arbitrable Issues**

Only in the event the Court finds the question of the arbitrability of Davis's claims has not

[6] Where the issue is before a court, the FAA provides that "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. "In order to show that the validity of the agreement is 'in issue,' the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate. The required showing mirrors that required to withstand summary judgment in a civil suit." *Great Earth*, 288 F.3d at 889. If the Court determines that Davis has raised a genuine issue as to any material fact as to whether a valid arbitration agreement exists, then "[t]he Federal Arbitration Act requires the district court to 'proceed summarily to the trial' of the disputed fact questions. The parties may not address other issues, including merits issues, before the court resolves these formation questions and [the] motion to compel." *Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 844 (6th Cir. 2021) (quoting 9 U.S.C. § 4). Clear Health expressly demands that any such trial be before a jury.

been delegated (unlike in *Rent-A-Center*, *Ciccio*, and *Nelums*, among others), and the Court must decide the question, it should answer in the affirmative.

In determining the scope of the arbitration clause, courts look at the parties' intent to submit the dispute to arbitration, starting at the language of the arbitration provision, and construing any doubt in favor of arbitrability in accordance with the strong federal policy favoring arbitration. *See, e.g., Mitsubishi*, 473 U.S. at 626 ("Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."). The Arbitration Agreement states, in relevant part:

> ***Should a dispute arise concerning the Website, Promotions, Content*, the terms and conditions of the Agreement or the breach of same by any party hereto: (a) *the parties agree to submit their dispute for resolution by arbitration* before a reputable arbitration organization as mutually agreed upon by the parties in New York, New York, in accordance with the then-current Commercial Arbitration rules of the American Arbitration Association** . . . .

Zitter Dec. at ¶ 10, Ex. A at 3-4 (italicized emphases added).

Davis's claim squarely concerns, at the least, the "Website."[7] The claim concerns his opt-in and the consent that he submitted on the website to be called by the list of marketing partners, including Prospects and Health Insurer Quotes, which is what led to the calls at issue and Plaintiff's transfer to Clear Health. *See* Grant Decl. at ¶¶ 3-6. In *Temple*, the court, applying New York law, found that largely identical language in an arbitration agreement[8] encompassed the plaintiff's TCPA claims because he "received the alleged contact from Defendants as a result of providing his information and assenting to the terms of the Agreement." *Id.* at 1307. The same is true here.

---

[7] The term "Website" is defined to mean the instant website through which the Terms and Conditions were accessed, *i.e.*, "our website," in other words, the "American Career Guide" website. *Id.* at 1.

[8] "Should a dispute arise concerning the Site Offering, the terms and conditions of the Agreement or the breach of same by any party hereto: (a) the parties agree to submit their dispute for resolution by arbitration before the American Arbitration Association in New York, New York in accordance with the then current Commercial Arbitration rules of the American Arbitration Association . . . ." 360 F. Supp. 3d at 1296-97.

Moreover, the fact that Davis's TCPA claim is a statutory claim does not place it outside the scope of a valid arbitration agreement. "It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA," "'unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'" *Gilmer*, 500 U.S. at 26 (quoting *Mitsubishi*, 473 U.S. at 628). "[T]he party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000). Nothing in the text or legislative history of the TCPA evidences any such intention.

**C. Clear Health Has Standing to Enforce the Arbitration Agreement**

Clear Health's standing to enforce the Arbitration Agreement has also been delegated to the arbitrator under controlling case law. *See Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021) ("[W]hether Rees can enforce the arbitration agreement against Swiger presents a question of arbitrability that Swiger's arbitration agreement delegated to an arbitrator."); *Nelums*, 2023 WL 6161997 at *5; *Cunningham v. Ford Motor Co*., No. 21-CV-10781, 2022 WL 2819115, *4 (E.D. Mich. July 19, 2022). Nonetheless, solely in the event the Court disagrees, Clear Health has standing to enforce the agreement as a third-party beneficiary and under the doctrine of estoppel.

"[A]rbitration agreements may be enforced by nonsignatories through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'" *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1643-44 (U.S. 2020) (internal quotation omitted). Under New York law, "signatories to an arbitration agreement can be compelled to arbitrate their claims with a non-signatory where "the relationship among the parties, the contracts they signed . . ., and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has

signed.'" *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005) (quoting *JLM Indus. v. Stolt–Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004)). A two-prong "intertwined-ness test" applied by courts in the Second Circuit examines "whether: (1) the signatory's claims arise under the subject matter of the underlying agreement, and (2) whether there is a close relationship between the signatory and the non-signatory party." *Temple*, 360 F. Supp. 3d at 1309.

The *Temple* decision is particularly instructive. As the court in *Temple* found in a similar situation involving the generation of a telemarketing lead from a submission and consent on a website that resulted in allegedly unlawful text messages, "Plaintiff's claim clearly arises under the subject matter of the Arbitration Provision. . . . Plaintiff's claim against Lending Tree concerns Lending Tree's contact of Plaintiff, which occurred as a result of Plaintiff utilizing the website's Contact Services." 360 F. Supp. 3d at 1310. Similarly here, Davis is suing over calls he attributes to Clear Health, but those calls were made by Prospects and related to Health Insurer Quotes, both of which are listed marketing partners he "consent[ed] to receive sales calls and/or text messages . . . from" on the Site. Zitter Dec. at ¶¶ 14-19. The only times Prospects communicated with Plaintiff where when he called Prospects on January 5, 2024 nearly four hours after an unanswered telephone call, which Prospects made solely based on the lead from C4R Media containing his information and relating to Health Insurer Quotes. Grant Decl. at ¶ 5. Thus, there can be no question that Davis's claims here arise under the subject matter of the underlying agreement.

There is also a sufficiently close relationship between the signatory and the non-signatory party. "To hold that the requisite close relationship is met, a court must find that the 'relationship among the parties [is] of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement.'" *Temple*, 360 F. Supp. 3d at

1310 (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008)). "[R]elationships are sufficiently intertwined where the non-signatory party is 'linked textually' to the underlying contract or where a signatory understood the extent of the non-signatory's involvement with respect to the signatories' relationship." *Id.* at 1310-11 (citations omitted). Both apply here. On the same webpage on the Site where Davis acknowledged that by clicking "Continue" he agreed to the Terms and Conditions, he also acknowledged he "agree[d] to . . . (iii) How It Works." Clicking on that hyperlink brings up a webpage that states, among other things:

> - **You will be asked to opt in**. When you sign up on this site, you will be asked to opt in to receive ads by email, text message, and/or phone.
>
> - **You will get marketing messages from us and our third party partners**. If you opt in, you will receive marketing messages from us and many of our partners, by email, phone, and/or text. . . . If you do not want to receive marketing messages or have your data shared, do not sign up or opt in.
>
> * * * * *
>
> We are able to provide you this free site based on your willingness to be contacted by us and our third party partners via email, telephone, and/or SMS. Consent to be contacted by phone or SMS is not required to use the site, but if you do opt in to this you will be contacted by us and our partners by phone and/or SMS with offers . . . .

Zitter Dec. at ¶ 10, Ex. B thereto.

And, of course, in submitting his information on the Site, Davis checked the box signifying that he "expressly consent[ed] to receive sales calls and/or text messages . . . from C4R Media or its marketing partners at the cellular/landline telephone number I have provided above . . . ." *Id.* at ¶¶ 12-20, Exhibits C & D thereto. "Accordingly, Plaintiff was on notice that his utilization of the website contact forms and simultaneous consent to the [Arbitration] Agreement would not merely create a relationship between Plaintiff and [C4R Media], but would also subject Plaintiff to potential relationships with a defined group of third parties" and persons calling on their behalf,

"including, resultantly, [Prospects, Health Insurer Quotes, and, based on his own allegations, Clear Health]." *Temple*, 360 F. Supp. 3d at 1311.

"Even if [Prospects, Health Insurer Quotes, or Clear Health] is deemed not to have been "linked textually" to the [C4R Media] Arbitration [Agreement] because it was not specifically named, Plaintiff reasonably should have known the potential involvement of the defined group of third parties." *Id.* The reasons for this are quite similar to those found in *Temple*:

> First, as just discussed, Plaintiff was at least generally on notice that one or more other parties might contact him. Second, it appears Plaintiff even had reason to know that Lending Tree, specifically, might contact him. Once on the website, but before continuing to submit information, users were informed that clicking "Get a Quote" meant that he or she agreed to share information with certain lenders and partners. The terms "lenders" and "partners" were underlined, containing hyperlinks. Those hyperlinks, when clicked, led the user to a list of names which included Lending Tree.

*Id.*

Similarly, the Site contained a hyperlinked list of marketing partners from whom Davis consented to receive "sales calls," giving Davis reason to know that a marketing partner may be contacting him as a result of his agreement with C4R. *See* Zitter Dec. at ¶¶ 12-20, Exhibits C & D thereto. And, indeed, that is precisely why he received the calls at issue. *See* Grant Dec. at ¶¶ 3-6. Thus, Davis should be estopped from avoiding arbitration with Clear Health over calls from Prospects because "the relationships among the parties developed in a manner that made it unfair for [signatory 1] to claim that its agreement to arbitrate ran only to [signatory 2] and not to [the non-signatory]. . . . In short, this is not a case where a non-signatory is a 'complete stranger' to a contract." *Temple*, 360 F. Supp. 3d at 1311 (internal quotation omitted).

## CONCLUSION

For the foregoing reasons, the Court should enter an order compelling the Plaintiff to arbitrate his claim and staying the proceedings until the arbitrator enters a final award.

Dated: June 3, 2024

GREENSPOON MARDER LLP

*/s/ Roy Taub*
Jeffrey A. Backman
(*pro hac vice* application forthcoming)
Roy Taub (*pro hac vice*)
200 E. Broward Blvd., Suite 1800
Ft. Lauderdale, FL 33301
(954) 491-1120
jeffrey.backman@gmlaw.com
mary.torres@gmlaw.com
roy.taub@gmlaw.com
cheryl.cochran@gmlaw.com

Douglas R. Sargent
Ohio Bar No. 97486
227 W. Monroe, Suite 3950
Chicago, IL 60606
(773) 395-1601
doug.sargent@gmlaw.com

*Attorneys for Defendant Clear Health, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 3, 2024, a true and correct copy of the foregoing was served on all counsel of record via CM-ECF.

*/s/ Roy Taub*
ROY TAUB